## MITCHELL et al. v. NEW YORK LIFE INS. CO.

### No. 5287.

Circuit Court of Appeals, Seventh Circuit.
Dec. 13, 1934.

Rehearing Denied Jan. 17, 1935.

The memorandum of Judge Barnes follows:

This cause came before the court on a bill of complaint seeking removal of New York Life Insurance Company as trustee beneficiary under two certain trust agreements, issued in connection with two certain policies of life insurance, written on the life of one Ernest I. Mitchell, a resident of Chicago, who died on June 1, 1933, as a direct result of injuries sustained by falling down an elevator shaft located in the Carbide & Carbon building, at 230 North Michigan avenue, Chicago. The bill of complaint also joins New York Life Insurance Company in its individual capacity as insurer, and asks that the court construe certain identical double indemnity provisions contained in the two contracts of insurance and that the court enter a decree which in substance and effect will order and direct the defendant insurance company, as insurer, to pay into the corpus of the trust the further sum of $36,-780, together with interest at 5 per cent from June 23, 1933, the date of demand; said sum being the total amount of the double indemnity provisions contained in said policies.

The language of the double indemnity provisions in the policies is as follows: "Double the Face of this Policy upon receipt of due proof that death of the Insured was caused directly by accident while traveling as a passenger on a street car, railway train, steamship licensed for regular transportation of passengers, or other public conveyance operated by a common carrier, and that such death occurred within sixty days after such accident."

The accident in question is described in the stipulation of the parties, upon which this case was tried, as follows:

"11. Before and at the time of his death, Ernest I. Mitchell was president of Mitchell, Faust, Dickson & Wieland, general advertising agents, tenants of and in the Carbide & Carbon Building, located at 230 North Michigan Avenue, Chicago, Illinois, with offices on the twenty-third floor of said building.

"12. The Carbide & Carbon building was and is a modern office building, thirty-six stories in height. The ground floor is occupied by retail stores and a lobby. The upper floors are tenanted by hundreds of persons, firms and corporations engaged in professional and mercantile pursuits. The building long has been and is operated by Oxweld Acetylene Company, a corporation organized for and engaged in the business of manufacturing and selling machinery. Oxweld Acetylene Company occupies a portion of one of the upper floors. All other occupants of the building are its lessees, paying rent for the respective spaces used by them.

"The conveyance of tenants and of persons having dealings with tenants in their offices and places of business in said building above the main floor was and is accomplished by means of passenger elevators. By the terms of their respective leases, it is provided that elevator service shall be furnished by the lessor daily from 8 o'clock A. M. until 6 o'clock P. M., Sundays and holidays excepted, and the lease of Mitchell, Faust, Dickson & Wieland, Inc., also so provided. There were and are two banks of such elevators, operated by Oxweld Acetylene Company, in shafts opening by doors into the lobby of the main floor. The entrance into the building from North Michigan Avenue faces eastward, and, upon entering the building lobby, one bank of elevators, to the right, faces south, and the other bank of elevators, to the left, faces north. The front of each elevator shaft, except when the elevator car within the shaft is being loaded or unloaded, is ordinarily automatically closed by sliding metallic doors, opaque and without window, opening or grill.

"13. On June 1, 1933, elevator car No. 1, being the easterly passenger elevator in the south bank, was temporarily out of order and had been taken out of service prior to 10 o'clock in the morning. A workman, not employed by Oxweld Acetylene Company, was engaged in making repairs upon the elevator car. There was, at his customary place of duty in the lobby of said building at the time said repairs were in progress, an employee of the Oxweld Acetylene Compa-

ny in the capacity of a starter for the elevator cars. The duties of said elevator starter consisted principally of supervising the arrival and departure of cars, and, in general, regulating the transportation of passengers to and from various floors in the building. It was not in the line of duty of said starter to engage in making repairs on the elevator cars. Said elevator starter, at the request of the workman, in order to assist said workman in making repairs to the elevator car, stepped into elevator No. 1 and drove the same up from the level of the main floor until the bottom of the elevator was slightly higher than the top of the doors from the elevator shaft into the lobby. The starter for the cars was thus enclosed within elevator car No. 1, and there was no other employee of Oxweld Acetylene Company in the lobby of the building. The workman then propped the automatic metallic doors wide open. Thus, the opening from the lobby into the shaft of elevator car No. 1 was standing open, but the elevator car itself was so high above said opening that it was not visible to any person being in the lobby of the building. Said workman then screwed an electric light bulb into a socket permanently fastened to the underside of the floor of the elevator car and lit the same, so that a light was shining in said shaft from a height and very much like the usual electric light in the ceiling of the car.

"14. While said repairs were being made under above conditions, and shortly after 10 o'clock A. M., Ernest I. Mitchell arrived at the building, intending to go to his office on the twenty-third floor by means of an elevator. He walked into the lobby, turned to his left, meaning to enter elevator car No. 1, and, instead, stepped into the shaft of elevator No. 1, and fell down the same to the floor of the shaft, a distance of approximately twenty-five feet. By means of such fall, he sustained bodily injuries as a result of which he came to his death on said day. The death of Ernest I. Mitchell was caused directly by said accident."

Two principal questions are brought to the court for decision: First, Was the insured, at the time of the accident, "traveling as a passenger"? and, second, Did the accident occur while the insured was "traveling as a passenger on a * * * public conveyance operated by a common carrier"?

The court is of the opinion, and holds, that the first question must be answered in the affirmative. The insured was at the time of the accident "traveling as a passenger."

London Guarantee & Accident Co. v. Ladd (C. C. A.) 299 F. 562.

■ The court is of the opinion, and holds, that the second question must be answered in the negative. The accident did not occur while the insured was traveling as a passenger on a public conveyance operated by a common carrier. The plaintiffs have called the court's attention to a number of Illinois cases, including the following: Beidler v. Branshaw, 200 Ill. 425, 65 N. E. 1086; Hartford Deposit Co. v. Sollitt, 172 Ill. 222, 50 N. E. 178, 64 Am. St. Rep. 35; Springer v. Ford, 189 Ill. 430, 59 N. E. 953, 52 L. R. A. 930, 82 Am. St. Rep. 464; Steiskal v. Marshall Field & Co., 238 Ill. 92, 87 N. E. 117; Anderson Art Co. v. Greenburg, 118 Ill. App. 220; and Field v. French, 80 Ill. App. 78—where it is said that persons operating elevators in buildings for the purpose of carrying passengers from one story to another are common carriers of persons, but the defendant points out, what is the fact, that in these cases the Illinois courts were merely stating a rule as to the degree of care required of operators of passenger elevators, and were not considering the question as to whether or not operators of elevators were common carriers. Southern Ry. Co. v. Taylor, 57 App. D. C. 21, 16 F.(2d) 517, at page 524.

A common carrier of passengers is one who undertakes for hire to carry all persons indifferently who may apply for passage, so long as there is room and there is no legal excuse for refusal. 4 Ruling Case Law, p. 1000; Rathbun v. Ocean Accident & G. Corp., 299 Ill. 562, 566, 132 N. E. 754, 19 A. L. R. 140.

In 9 Ruling Case Law, pp. 1236, 1237, it is said: "Whether the proprietor of a passenger elevator is a common carrier in the management thereof, is a question which has occasioned considerable difficulty, and the authorities are not in agreement. * * * When the question is squarely presented, and when it is sought to construe a statute referring to the duties or liabilities of 'common carriers,' it is held that such expression does not refer to the proprietors of elevators"—citing Seaver v. Bradley, 179 Mass. 329, 60 N. E. 795, 88 Am. St. Rep. 384, opinion by Chief Justice Holmes.

In Bigby v. U. S. (C. C.) 103 F. 597, 598, it was held: "The United States was not a common carrier in the operation of such elevator, for 'no one can be considered as a common carrier unless he has in some way held himself out to the public as a carrier in

'such manner. as to render him liable to an action if he should refuse to carry for any one who wished to employ him.' Allen v. Sackrider, 37 N. Y. 341, 342."

In Ogburn v. Travelers' Ins. Co. (Cal. App.) 269 P. 728, it was held that a hotel elevator was not a "conveyance provided by a common carrier" within the terms of an accident insurance policy.

In Southern Ry. Co. v. Taylor, 57 App. D. C. 21, 16 F.(2d) 517, page 523, it was said: "A street car, for example, and an elevator, are both instrumentalities for the carrying of passengers, and the duty of exercising the highest degree of care in their operation for the safety of passengers is equally imposed. It, however, by no means follows that, because a street car is a common carrier, an elevator is also a common carrier. The distinction is clear. In the first instance, we are dealing with a public utility, operated for the accommodation of the public generally, required to give service to all who apply, bringing themselves within its lawful rules and regulations. In the latter instance, we are not dealing with a public utility, but with a private instrumentality, operated to carry such persons in and about the building as to whom the owner may see fit to extend the accommodation."

The court is further of the opinion that, since the general term "other public conveyance operated by a common carrier" follows enumerated particular conveyances, that is, "street car, railway train, steamship licensed for. regular transportation of passengers," the general term includes, under the doctrine of ejusdem generis, only conveyances of the same general kind as the particular conveyances enumerated, and that a passenger elevator would not be included in the general term of the policy. Pulom v. Jacob Dold Packing Co. (C. C.) 182 F. 356; O'Connor v. Great Lakes Pipe Line Co. (C. C. A.) 63 F.(2d) 523.

Edmund S. Cummings, Joseph W. Cummings, and Hubert Van Hook, all of Chicago, Ill., for appellants.

Homer H. Cooper and Wendell J. Brown, both of Chicago, Ill., and Louis H. Cooke, of New York City, for appellee.

Before ALSCHULER, EVANS, and FITZHENRY, Circuit Judges.

FITZHENRY, Circuit Judge.

Appellants prosecute this appeal to reverse the decree of the District Court in favor of appellee. Upon the hearing in the

District Court, the facts were stipulated by the respective parties and were fully set forth in the memorandum of the District Court, and the law applicable thereto was fully and accurately considered and applied. No good purpose would be served by another discussion of the facts and the law. The memorandum of District Judge Barnes is therefore approved and adopted as and for the opinion of this court.

The decree is affirmed.